INTERNATIONAL HOUSING
LIMITED, Plaintiff,

v.

RAFIDAIN BANK IRAQ, Defendant.

No. 87 Civ. 8646 (RJW).

United States District Court,
S.D. New York.

May 17, 1989.

Debevoise & Plimpton, New York City, Robert B. Von Mehren, Edwin G. Schallert, of counsel, Riker, Danzig, Schere & Hyland, Morristown, N.J., Douglas S. Eakeley, of counsel, for plaintiff.

Richards & O'Neil, New York City, Charles E. Dorkey, III, Robert P. Boatti, of counsel, for defendant.

WARD, District Judge.

Plaintiff International Housing Limited ("IHL"), commenced this action against defendant Rafidain Bank Iraq ("Rafidain"), pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), *codified at* 28 U.S.C. §§ 1330; 1332(a)(2)–(4); 1391(f); 1441(d); and 1602–1611, in order to enforce a default judgment entered in the Commonwealth of the Bahamas. Pursuant to the FSIA and the Uniform Foreign Money–Judgments Recognition Act (the "Foreign

Act"), New York Civil Practice Law and Rules §§ 5301 *et seq.*, a default judgment was entered in the present lawsuit on September 23, 1988. Rafidain moves to vacate the default judgment pursuant to Rule 60(b)(4), Fed.R.Civ.P., on the ground that it is void because the Court lacks subject matter jurisdiction and/or personal jurisdiction. In the alternative, Rafidain moves to dismiss the action on the ground of *forum non-conveniens*. For the reasons that follow, the motion is granted, the default judgment is vacated, and the action is dismissed.

## BACKGROUND

IHL is a holding corporation organized under the laws of the Cayman Islands. IHL's primary business involves the selling, leasing, or contracting to use architectural molds for concrete structures. The molds are manufactured in the United States by a subsidiary of IHL. IHL initially maintained an office in Connecticut, but moved this office to Florida in 1979.[1]

Rafidain is a banking corporation organized under the laws of Iraq and owned by the government of Iraq. Rafidain does not maintain a place of business, branch office, any employees, or any real property in the United States. It is not qualified nor licensed to do business in the United States. Rafidain does maintain a correspondent banking relationship with several American banks in New York City, including Irving Trust Company ("Irving Trust").

In 1975 IHL contracted with the Governorate of Diyala Province, Iraq (the "Governorate"), a division of the government of Iraq, to provide 740 low-cost housing units in Diyala at a base price of $5.4 million. The contract provided for periodic payments to be made to IHL as construction was completed and for an advance payment which was secured by a guarantee issued by Rafidain (the "advance payment guarantee"). In addition, as security for IHL's performance, a bank guarantee was issued by Rafidain (the "performance guarantee"). Rafidain required IHL to obtain corresponding counter-guarantees from a non-

Iraqi bank, which IHL secured from the Royal Bank of Canada ("Royal Bank"). IHL's guarantees with Royal Bank (the "counter-guarantees") were conditioned upon IHL indemnifying Royal Bank for any payments it would have to make. Neither the contract between IHL and the Governorate nor the guarantees involving Royal Bank and Rafidain provided for any payment or other activity in the United States.

During the performance of the contract, IHL maintains that the Governorate repeatedly failed to fulfill its obligations to make required payments. At the same time, IHL contends that the Governorate assured it that full payment would be made upon completion of the project. In order to continue the construction, IHL obtained temporary financing from Rafidain through lines of credit known as "overdraft facilities". Rafidain required IHL to obtain repayment guarantees ("overdraft guarantees") which IHL arranged with Royal Bank. Six overdraft facilities and corresponding overdraft guarantees, worth a total of approximately $1.2 million, were executed between 1976–1977. These overdraft guarantees were issued by Royal Bank in the Bahamas. The overdraft guarantees did not provide for any action to occur in the United States.

According to IHL, construction of the housing was completed in 1978, but the Governorate refused to pay the money due IHL under the contract. After upheavals in the national and local governments in Iraq, the Governorate's successor repudiated any obligations owed to IHL, and made no further payments under the contract.

In late 1979, Rafidain allegedly began to demand payment from Royal Bank on the advance payment and performance counter-guarantees. Apparently, no payment under the counter-guarantees was made. In February 1980, the Governorate seized all of IHL's assets in Iraq, including American made equipment worth approximately $450,000. At this time, Rafidain began to make demands for payment from Royal

---

**1.** IHL has not identified its principal place of business.

Bank under all six overdraft guarantees. The demands were sent to Royal Bank in the Bahamas. In these demands, Rafidain directed Royal Bank to credit the funds to Rafidain's account with Irving Trust in New York. Two such demands were honored by Royal Bank and payment for over $221,000 was made to Rafidain through its New York account and debited to IHL's account in or about June and November 1980.

IHL brought suit seeking a preliminary and permanent injunction in New York State Supreme Court to prevent Royal Bank from transferring over $800,000 to Rafidain pursuant to the four remaining overdraft guarantees. In a decision dated June 30, 1981, the New York State Supreme Court granted Royal Bank's motion to dismiss the case on *forum non-conveniens* grounds, holding that the most appropriate forum for the action was the Bahamas.

IHL commenced an action in the Bahamas and initially was able to enjoin Royal Bank from making the payments on the overdraft guarantees. Eventually, the Bahamian court dissolved the injunction finding that IHL had an adequate remedy at law. Royal Bank then made payment under the overdraft guarantees to Rafidain in or about November 1981. In or about April 1985, IHL and Royal Bank reached a settlement with respect to IHL's obligation to indemnify Royal Bank for its payments.

IHL sought damages against Rafidain in the Bahamian court based on Rafidain's alleged fraudulent and untimely demands for payment from Royal Bank. Rafidain was served with notice of the action, but failed to appear, and a default judgment was entered on or about July 23, 1985. An amended final judgment was entered against Rafidain on or about October 21, 1985, awarding IHL $850,000 plus interest.

IHL then sought to enforce the Bahamian judgment in this Court pursuant to the FSIA and the Foreign Act. After Rafidain failed to file an answer, despite service of the summons and complaint, IHL presented affidavits to the Court sufficient to warrant the entry of a default judgment. On September 23, 1988, a default judgment was entered pursuant to 28 U.S.C. § 1608(e). Rafidain now moves to vacate that default judgment pursuant to Rule 60(b)(4), Fed.R.Civ.P.

## DISCUSSION

Rule 60(b)(4), provides that the court may relieve a party from a final judgment when "the judgment is void." If the Court lacks subject matter jurisdiction over the case or personal jurisdiction over a defendant, then a judgment rendered in that case or against that defendant is void and can be vacated. *See Collins v. Foreman,* 729 F.2d 108, 111 (2d Cir.), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); C. Wright & A. Miller, *Federal Practice and Procedure: Civil,* § 2862 (1973). A defendant who had notice of the original action has the burden of proof in contesting jurisdiction in a motion under Rule 60(b)(4). *Bally Export Corp. v. Balicar,* 804 F.2d 398, 401 (7th Cir.1986); *Rohm & Haas Co. v. Aries,* 103 F.R.D. 541, 544 (S.D.N.Y.1984).

### A. *Sovereign Immunity*

Rafidain asserts that the default judgment entered against it in this court is void for lack of jurisdiction since it is an entity of the government of Iraq entitled to sovereign immunity. The parties do not dispute that Rafidain is "an agency or instrumentality of a foreign state" and as such, is to be treated as a foreign state in determining this Court's jurisdiction.[2] The FSIA governs the assertion of subject matter and personal jurisdiction over a foreign state. 28 U.S.C. §§ 1602–1611.

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**2.** Under the FSIA, a "'foreign state' ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state...." 28 U.S.C. § 1603(a).

28 U.S.C. § 1604. The FSIA codifies a restrictive theory of sovereign immunity which confines immunity from suit to a foreign sovereign's public, governmental acts. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 487–88, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). The district courts are endowed with both subject matter and personal jurisdiction over nonjury civil actions against foreign states in which an exception to sovereign immunity is applicable. 28 U.S.C. § 1330(b). When an exception to immunity applies, "the foreign sovereign is liable in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S. C. § 1606.

### 1. Subject Matter Jurisdiction

■] IHL maintains that the Court has subject matter jurisdiction over this action under the exception to immunity found in 28 U.S.C. § 1605(a)(2). This exception was designed to ensure that when a sovereign is acting in a commercial context as a private entity, it cannot avoid its obligations through donning the armor of immunity.[3] Section 1605(a)(2) provides, in pertinent part, that:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
> ....
> (2) in which the action is based ... upon an act outside the territory of the United States in connection with a commercial

activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

There is no dispute that the banking activities of Rafidain in connection with this case fall within the scope of commercial activity under the FSIA.[4] Likewise, the facts clearly indicate that the commercial activity involved with the construction contract and the related guarantees occurred outside the territory of the United States. The sole issue to be resolved is whether the concededly commercial activities of Rafidain which occurred outside the United States had a direct effect in the United States.

The terms "direct effect" and "in the United States" are not easily susceptible of precise definition. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 311–12 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).[5] Analyzing whether the facts of a particular case support a conclusion that a direct effect occurred in the United States, can be "an enterprise fraught with artifice." *Id.* at 312. The Court is to be guided by congressional intent in interpreting the FSIA and is to be mindful of "Congress's concern with providing 'access to courts' to those aggrieved by the commercial acts of a foreign sovereign...." *Id.* (citation omitted).[6] The application of the exception in section

---

3. The findings and declaration of purpose provision of the FSIA states that:

> [u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities.

28 U.S.C. § 1602.

4. "A 'Commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d).

5. In *Texas Trading,* breach of contract actions were brought by four United States companies against the Federal Republic of Nigeria and its central bank. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at

303. The Second Circuit examined the legislative history of the FSIA and analyzed the "direct effects in the United States" exception to sovereign immunity under section 1605(a)(2). A direct effect in the United States was found to have occurred because each plaintiff was an American company that would suffer financial loss in the United States due to the contracts being breached and because each plaintiff was to present documents and collect payments under the contracts in the United States. *Id.* at 312.

6. "Before the FSIA, plaintiffs enjoyed a broad right to bring suits against foreign states, subject only to State Department intervention and the presence of attachable assets. Congress in the FSIA certainly did not intend significantly to constrict jurisdiction; it intended to regularize it." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 313.

1605(a)(2) will necessarily turn on the complete factual circumstances of each case.

IHL principally relies on the payment of certain overdraft guarantees by Royal Bank into Rafidain's correspondent account in Irving Trust as evidencing a direct effect in the United States.[7] Rafidain argues that IHL has insufficient contact with the United States for the application of the section 1605(a)(3) exception. Both parties cite a number of the same cases in support of their respective arguments. In these cases, a foreign state or entity breached a contractual obligation or failed to make payment in the United States as provided for under a contract. The courts looked to the financial consequences of these acts on the corporate plaintiff to determine if a direct effect occurred in the United States because no other affirmative activity had taken place in the United States. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 312; *Carey v. National Oil Corp.,* 592 F.2d 673, 676–77 (2d Cir.1979) (per curiam) (suggesting that the cancellation of a contract involves a direct effect where the corporate plaintiff is located and holding that no direct effect occurred in the United States for financial loss suffered by a corporation organized in the Bahamas); *Exchange National Bank of Chicago v. Empresa Minera del Centro del Peru S.A.,* 595 F.Supp. 502, 505 (S.D.N.Y.1984) (repudiation of promissory note caused direct effect in United States for American entity although insufficient contacts existed to support jurisdiction under the FSIA).

Additionally, in *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1346 (11th Cir.1982), an American plaintiff sought to prevent a foreign state bank defendant from making payment under a letter of credit or receiving payment under a standby letter of credit from a third party American bank. The Second Circuit noted that the foreign bank was involved with structuring the terms of the letter of credit arrangement and that the arrangement, which involved an American bank, extended into the United States and had significant, foreseeable financial consequences here, where the plaintiff was located. *Id.* at 1351. Therefore, the foreign bank's demand for payment on the letters of credit created a direct effect in the United States. *Id.*[8]

---

7. IHL presents four events which it claims support finding of a direct effect in the United States:

"1. At Rafidain's specific and repeated direction and as a result of Rafidain's fraudulent demands under bank guarantees issued on behalf of IHL, over $200,000 was paid into Rafidain's New York City account with Irving Trust Company.

2. Rafidain's improper demands resulted in direct financial injury to IHL in the United States.

3. At Rafidain's direction, over $400,000 in American-made equipment owned by IHL was seized in Iraq in an attempt to coerce additional guarantees and payments to Rafidain's New York account. The seizure prevented the sale of such equipment and resulting transfer of proceeds into IHL's Florida bank account.

4. As a result of Iraq's wrongful conduct in connection with the contract, IHL was forced to transfer nearly $1 million from its main bank account in New York City to Rafidain for the account of IHL in order to complete performance of the contract."
Memorandum in Opposition, filed March 22, 1989 at 2–3.

The Court, and the parties, have focused on IHL's first claim. The facts do not appear to support a finding that the actions of Rafidain resulted in a direct financial loss to IHL in the United States. While IHL may have been injured by Rafidain's actions, it is a Cayman Islands corporation which had no contractual agreement for any activity between it and Rafidain to occur in the United States. In addition, IHL's assertions regarding the effects of the seizure of its equipment in Iraq and its payments for construction support at most an indirect effect in the United States, insufficient to supply jurisdiction under section 1605(a)(2). *See Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1514–15 (D.C.Cir.1988) (failure of foreign state to honor guarantee and make payment to American citizen for services performed in the foreign state did not cause a direct effect in the United States despite allegations of ultimate financial loss in the United States).

8. In *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390, 394 (2d Cir.1985) the nexus between the commercial transaction and the United States was a contractual requirement that loan payments be made by a foreign corporate plaintiff to a foreign state bank defendant's New York branch bank and then transferred to an account maintained by a another foreign entity in a different New York bank. These payments were never made. The

None of these cases addressed the situation confronting the Court in the present action, where defendant has actually received payment in the United States because of its alleged fraudulent demands. Nevertheless, the willingness to find a direct effect in the United States based on the financial loss occasioned by a breach of contract or omission of activity in the United States supports finding such a direct effect in this case, where actual receipt of funds occurred in the United States pursuant to Rafidain's specific instructions.

■ Rafidain also argues that no direct effect in the United States should be found because IHL is a foreign corporation.[9] The FSIA, however, does not prohibit foreign corporations from bringing suit in the courts of the United States as long as the substantive standards of the FSIA are satisfied. *Verlinden B.V. v. Central Bank of Nigeria, supra,* 461 U.S. at 490–91, 103 S.Ct. at 1969–70.

The district court in *L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 121 (S.D.N.Y.1988) concluded that the nonpayment of a contractual debt payable in the United States by a foreign state to a foreign company did cause a direct effect in the United States.[10] A strong public policy exists in favor of enforcing commercial contracts between parties when the contracts call for payment to be made in the United States. This policy facilitates certainty in commercial transactions where parties purposefully involve the United States and ensure that such transactions will be governed by recognized principles of contract law. *See L'Europeenne de Banque v. La Republica de Venezuela, supra,* 700 F.Supp. at 122. While there was no contractual agreement for payment to be made in the United

States, Rafidain's acts of demanding payment in New York and the receipt of such payment in New York provide a sufficient nexus with the United States to support subject matter jurisdiction over this transaction.

The Court concludes that payment of the funds in the United States was a direct effect of Rafidain's demands upon Royal Bank under the overdraft guarantees and, as such, was a direct effect in the United States of Rafidain's commercial activity.

### 2. *Personal jurisdiction*

The jurisdictional provisions of the FSIA provide that:

> Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) [providing for subject matter jurisdiction] where service has been made under Section 1608 of this title.

28 U.S.C. § 1330(b).

A strict statutory construction of section 1330(b), however, may fail to incorporate the constitutional constraints of due process in exercising personal jurisdiction over a defendant. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (defendant must have sufficient minimum contacts with the forum so that maintenance of the suit does not offend traditional notions of fair play and substantial justice).

> [T]he [FSIA] cannot create personal jurisdiction where the Constitution forbids it. Accordingly, each finding of personal jurisdiction under the FSIA requires, in addition [to a finding of subject matter jurisdiction and proper service of process], a due process scrutiny of the court's power to exercise its authority over a particular defendant.

to a plaintiff which was a foreign corporation. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 312 n. 34.

**10.** The court in *L'Europeenne* concluded that it did not have personal jurisdiction under the FSIA because defendant's minimum contacts with the United States, constitutionally required by due process, were lacking. *Id.* at 125.

Second Circuit noted that while "this nexus might be insufficient to sustain jurisdiction under [section 1605(a)(2) ], that question [was] not before [the court] as jurisdiction was premised solely upon a waiver of immunity under section 1605(a)(1)." *Id.*

**9.** The Second Circuit expressly declined to decide the question of whether a direct effect could be found when a contract was breached and payment was not made in the United States

*Texas Trading & Milling v. Federal Republic of Nigeria, supra,* 647 F.2d at 308. Under the direct effects in the United States exception to sovereign immunity in section 1605(a)(2), it would appear that subject matter jurisdiction could exist without the foreign state defendant having the minimum contacts required by due process to sustain personal jurisdiction.

In response to the discrepancy between section 1330(b) and the requirements of due process in the application of section 1605(a)(2), the federal judiciary has adopted two somewhat inconsistent approaches in its analysis of the jurisdictional provisions.[11] The inconsistencies in the treatment of the jurisdiction provisions muddle the case law concerning the FSIA which is especially significant in the application of the statute because the skeletal nature of the FSIA was designed to leave the full development of sovereign immunity law to the courts. *See Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1106 (S.D.N.Y.1982).

A number of courts have attempted to reconcile section 1330(b) with the mandates of due process by finding direct effects sufficient to sustain subject matter jurisdiction under section 1605(a)(2) only when these effects also satisfy the minimum contacts requirement of *International Shoe. See Carey v. National Oil Corp., supra,* 592 F.2d at 677; *Exchange National Bank of Chicago v. Empresa Minera del Centro del Peru S.A., supra,* 595 F.Supp. at 505 (S.D.N.Y.1984).

■ This Court, however, believes that keeping the discussion of subject matter jurisdiction and constitutional personal jurisdiction distinct creates a more precise analytical framework in which to determine the jurisdictional issues presented by the interplay of section 1330(b) and section 1605(a)(2). This approach treats section 1330(b) as a statutory jurisdictional provision, not a constitutional requirement. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 308, *L'Europeenne de Banque v. La Repu-*

*blica de Venezuela, supra,* 700 F.Supp. at 122; *Gibbons v. Udaras na Gaeltachta, supra,* 549 F.Supp. at 1117. Under this approach, subject matter jurisdiction under section 1605(a)(2) can be found irrespective of the constitutionally required minimum contacts for personal jurisdiction. After a finding of subject matter jurisdiction under 1605(a)(2), the court must then engage in an analysis of the constitutional basis for personal jurisdiction. Accordingly, the Court now turns to the question of whether Rafidain had minimum contacts with the United States which could constitutionally support the exercise of personal jurisdiction.

At least four factors have been identified as bearing on the proper exercise of personal jurisdiction over a foreign state defendant: (1) the extent to which defendant availed itself of the privileges of American law; (2) the extent to which litigation in the United States would be foreseeable to defendant; (3) the inconvenience to defendant of litigating in the United States and (4) the countervailing interests of the United States in hearing the suit. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 314.

■ IHL's sole contention regarding Rafidain's contact with the United States revolves around the maintenance of correspondent bank accounts in the United States. Correspondent banking relationships are used to facilitate international financial transactions and money transfers. Courts have generally held correspondent bank accounts alone to be insufficient to confer personal jurisdiction over a defendant. *Exchange National Bank of Chicago v. Empresa Minera del Centro del Peru S.A., supra,* 595 F.Supp. at 505; *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1293 (S.D.N.Y.1980) *aff'd on other grounds,* 647 F.2d 320 (2d Cir. 1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Amigo Foods Corp. v. Marine Midland Bank–New York,* 39 N.Y.2d 391, 396, 384

---

**11.** *See Falcoal, Inc. v. Turkiye Komur Isletmeleri Kurumu,* 660 F.Supp. 1536, 1541 (S.D.Tex.1987) (review of two divergent approaches used in examining jurisdictional provisions of FSIA).

N.Y.S.2d 124, 127, 348 N.E.2d 581, 584 (1976).

Nevertheless, IHL argues that the amount of banking activity conducted by Rafidain through its New York accounts and the acts of Rafidain in demanding payment into the Irving Trust account are sufficient minimum contacts to invoke personal jurisdiction. *Cf. Hatzlachh Supply Inc. v. Savannah Bank of Nigeria,* 649 F.Supp. 688, 691 (S.D.N.Y.1986) (maintenance of bank accounts in United States availed defendant of privileges of American law and defendant's other contacts with the United States were sufficient to satisfy requirement of personal jurisdiction under *Texas Trading* ).

The only contact with the correspondent account in this case was the payment by Royal Bank under the overdraft guarantees. While Rafidain directed payment be made in the United States, this was not a contractual requirement under the guarantees; Royal Bank could have made payment anywhere. *See Leema Enterprises, Inc. v. Willi,* 575 F.Supp. 1533, 1537 n. 1 (S.D.N.Y.1983) (The maintenance of a correspondent bank account in New York which passively received $200,000 in money alleged to be connected to fraud was insufficient to confer personal jurisdiction as the transfer could have been made to an account anywhere in the world). The underlying contract, the guarantees, and the parties completely lacked any direct relationship with the United States. The absence of any direct United States contact other than the use of the correspondent bank account does not support a conclusion that Rafidain could have reasonably anticipated litigation regarding this transaction in the United States. The use of the correspondent bank account to receive payment, in the overall context of this case, does not satisfy the minimum contacts requirement of due process.

Moreover, there are significant policy reasons which caution against the exercise of personal jurisdiction based only on the receipt of funds in a correspondent bank account. The district court in *Verlinden B.V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1298, observed that, in the context of international financial transactions:

> New York would be detrimentally served by a decision subjecting foreign customers of its banks to the in personam jurisdiction of American courts wherever they advise credits to foreign beneficiaries through American banks. It would not be unrealistic to suggest that foreign states, aware that the destination of American banks as advisors of letters of credit would in consequence subject them to in personam jurisdiction in the event of a claimed breach, would have little hesitancy or difficulty in designating banks in foreign lands. It could hardly be the purpose of Congress to force the loss of such business upon the American financial community.

*Id.* at 1298. *Accord, Italian Int'l. Bank Ltd. v. Banco Industrial de Venezuela,* 1984 WL 438 (S.D.N.Y.1984) (argument that jurisdiction cannot be predicated on the existence of correspondent New York banking relationships and the use of those correspondents to effectuate payment seems correct);[12] *Cf. L'Europeenne de Banque v. La Republica de Venezuela, supra,* 700 F.Supp. at 122 (concerns expressed in *Verlinden* are insufficient to prevent the exercise of subject matter jurisdiction due to the desirability of enforcing contractual agreements, but these concerns are addressed in the due process personal jurisdiction analysis under the FSIA). Indeed, the Supreme Court in a non-FSIA case has indicated that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Industry Co., Ltd. v. Superior Court,* 480 U.S. 102, 115, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987) (citation omitted). The absence of an American party to this dispute as well as the absence of any contractual provision requiring activity to occur in the United States further constrict any in-

---

**12.** Nonetheless, the district court in *Italian Int'l Bank* found personal jurisdiction to exist due to actions of defendant's New York agent in connection with the transaction in issue.

**1120**

terest the United States has in providing a forum for IHL's claim.

The Court concludes that Rafidain's involvement with the United States through its correspondent bank account does not provide the requisite minimum contacts needed to sustain personal jurisdiction. Accordingly, the default judgment against Rafidain is void and must be vacated.

**B.** *Forum non-Conveniens*

 The Court's conclusion that it lacks personal jurisdiction moots this alternative ground for dismissal relied upon by Rafidain. The Court does note, however, that a motion to dismiss on *forum non-conveniens* grounds is inappropriate in the procedural context of this case, as a default judgment had already been entered in this action.

CONCLUSION

Rafidain's motion to vacate the default judgment entered against it on September 23, 1988 is granted as the Court lacks personal jurisdiction over Rafidain as required by the FSIA in order to enter a valid final judgment against a foreign sovereign defendant. The default judgment is hereby vacated and the action is dismissed.

It is so ordered.