Bruce E. MONES, Petitioner,

v.

**COMMERCIAL BANK OF KUWAIT, S.A.K., Respondent.**

No. 18 Misc. 0302(SAS).

United States District Court, S.D. New York.

July 31, 2007.

Charles H. Camp, Esq., Law Offices of Charles H. Camp, Washington, D.C., for Petitioner.

George F. Hritz, Esq., Jeffrey D. Ratner, Esq., Hogan & Hartson, L.L.P., New York City, for Respondent.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

On December 4, 2003, Bruce E. Mones filed a Notice of Petition of Issuance of Order for Payment or Delivery of Property of Judgment Debtors in the Possession of Commercial Bank of Kuwait, S.A.K. ("Petition for Turnover Order"). The purpose of the Petition is to enforce a judgment rendered by the United States District Court for the District of Columbia on June 18, 2003, against the Limited Partner Judgment Debtors ("debtors").[1] Initially, this Court granted the Petition for Turnover Order, but subsequently vacated that judgment on the ground that the funds sought by Mones were held in Kuwait and this Court lacked authority to direct the Commercial Bank of Kuwait ("CBK") to transfer the assets of the judgment debtors from Kuwait into New York.[2] Mones appealed the judgment to the Second Circuit Court of Appeals, which declined to hear the merits of the appeal pending this Court's determination of whether it has personal jurisdiction over CBK.[3] For the following reasons, this Court does not have jurisdiction over CBK.

## II. BACKGROUND[4]

CBK is headquartered in Kuwait. For many years, it maintained a New York branch which conducted regular banking operations. In 2003, however, CBK's Board of Directors ordered the New York branch to close. Following the Board's directive, the New York branch began to liquidate its assets on June 30, 2003, and

---

1. The Limited Partner Judgment Debtors are comprised of all of the limited partners of Special Situation Investment Holdings, Ltd. and Special Situation Investment Holdings, L.P. II, including: Astrolabe General Trading & Contracting Co.; Al–Nabah General Trading Co. W.L.L.; Salah Mohammed Ali Wazzan; Hamad M. Al Wazzan; Safir International Hotel Management; M/S/M W.L.L; Mohammed Ali Naki; Financial Group of Kuwait KSC; Dana Investment C.V.; Anoroc Limited; Securities Group Co. KSC; Kuwait Portland Cement Co. K.S.C.; Adel Yaquob Al Ghanim; Ali M.T. Alghanim and Fouad M.T. Alghanim; Sheikh Ali Salem Ali Ali Salem Al Sabah; and Sheikh Ahmad Yousef Soud Al Sabah.

2. For a full recitation of facts and procedural history, see *Mones v. Commercial Bank of Kuwait, S.A.K.,* 399 F.Supp.2d 310, 311 (S.D.N.Y.2005); *Walker v. Mones (Intervenor Mobile Telecomm. Co.),* Civ. No. 96–2876, 2007 WL 1576325 (D.D.C. May 30, 2007); *Walker v. Mones,* No. 04–7088, 2004 WL 2943628 (D.C.Cir. Dec. 20, 2004).

3. *See Mones v. Commercial Bank of Kuwait, S.A.K.,* 204 Fed.Appx. 988, 2006 WL 3308202 (2d Cir.2006) (remanded to district court).

4. The facts discussed herein are relevant only to the personal jurisdiction. For a full recitation of facts and procedural history, see *Mones,* 399 F.Supp.2d at 310, and *Mones,* 2007 WL 1576325, at *1.

had completed transferring all outstanding credit balances pursuant to customer instructions by mid-July.[5] CBK's own funds were retained at the National Bank of Kuwait in New York through the completion of the liquidation proceedings and the final closing of the CBK branch which occurred on March 31, 2004. CBK maintained that account through July 5, 2005.[6]

In furtherance of the liquidation process, CBK took a number of steps to comply with pertinent regulations. It notified the Office of the Comptroller of the Currency (the "OCC") in Washington, D.C., and published various notices in local newspapers of the liquidation proceedings pursuant to section 3102 of Title 12 of the United States Code.[7]

On November 30, 2003, CBK rented a temporary administrative office in New York complete with a telephone and fax line ("liquidation office").[8] The initial lease on that space continued through February 28, 2004, which CBK renewed at the end of February for an additional month.[9] Despite renting the liquidation office, CBK did not vacate its original banking office at 1120 Avenue of the Americas until Febru-

ary 28, 2004.[10] CBK thus maintained two offices in New York from December 1, 2003 through February 28, 2004.

To handle the liquidation and closure, CBK maintained two full time employees: Elham Mahfouz, the General Manager of the New York branch, and Aralsothy Shanmugam, the Financial Controller for the New York branch.[11] In November 2003, Mahfouz returned to Kuwait to resume her full-time duties at CBK's headquarters, leaving Shanmugam as the sole employee handling the liquidation and closure of the bank's New York branch. On January 16, 2004, over a month after Mones filed this action, the OCC formally recognized CBK's liquidation.[12] Shanmugam continued to work on other aspects of the bank's closure through March 2004.[13] Mones served process on CBK in Kuwait via DHL Express on December 11, 2003.

Kuwait signed the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters ("Convention") in 2002 as a non-member state of the Hague Conference on Private International Law (the "Conference").[14] The Convention provides

---

5. In a letter to a vice president at the National Bank of Kuwait, dated June 23, 2003, CBK wrote that its board of directors in Kuwait had decided to discontinue operations in New York and that, accordingly, "our New York Branch will close its business operations effective 30th of June, 2003 and will commence liquidation process from 1st of July." See 6/23/03 Letter from Elham Mahfouz and Arulsothy Shanmugam to the National Bank of Kuwait, Exhibit ("Ex.") 7 to Plaintiff's Memorandum of Law in Support of Jurisdiction ("Pl.Mem.").

6. See CBK's 7/05/05 Certification Regarding Correspondent Accounts, Ex. 8 to Pl. Mem.

7. See CBK's Memorandum of Law in Opposition to Jurisdiction ("Def.Mem.") at 3.

8. See 11/18/03 "Office Service Agreement" by Executive Workstations, Ex. 1 to Pl. Mem.

9. See 2/17/04 "Office Service Agreement" by Executive Workstations, Ex. 1 to Pl. Mem. (extending the lease through March 31, 2004).

10. See 2/3/04 Letter from Arulsothy Shanmugam to Ross Spitalnick, Director of Sales, Executive Workspace, Ex. 1 to Pl. Mem.

11. See Def. Mem. at 3.

12. See 2/14/04 excerpt at p. 39 of the OCC's Weekly Bulletin for the week indicating that CBK's liquidation and termination became effective on January 16, 2004, Ex. 6 to Pl. Mem.

13. See Def. Mem. at 3.

14. See Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 UST 361, TIAS No. 6638 (1965).

means for international service for dispute resolution through various channels, including service by mail under Article 10.[15] Article 10 states in relevant part: "Provided the State of destination does not object, the present Convention shall not interfere with—a) the freedom to send judicial documents, by postal channels, directly to persons abroad . . . ." CBK claims that Kuwait did in fact object to service by mail of judicial documents when it joined the Convention. As evidence of Kuwait's objections, CBK cites to Kuwaiti Law No. 7 of 2002, which approved the accession to the Convention on the Service Abroad of Documents in Civil and Commercial Matters.[16] This law does in fact state Kuwait's objection to service by mail. However, it appears that these objections were never received by the Ministry of Foreign Affairs of the Netherlands (the "Ministry"), the agency which served as the secretary to the Convention at the time Kuwait joined the Convention. Indeed, it was not until Kuwait filed, or perhaps re-filed, its objection to service by mail with the Ministry on June 29, 2005, that the Ministry formally recognized this objection.[17]

Kuwait, however, notified the Ministry of its objection to service by mail prior to June 29, 2005. In mid–2003, the Convention updated its service of process manual by forwarding a questionnaire to every signatory country, asking each country to provide the Ministry with updated information, declarations, and objections.[18] Kuwait's response, which was due on September 15, 2003, clearly indicated the country's objection to service of process by mail.[19] However, the Convention did not publish a summary of the responses to the questionnaires until February, 2004, more than one month after Mones had served process on CBK.[20]

## III. LEGAL STANDARDS

### A. Service of Process

The acceptable methods of service of a summons and complaint in federal court are set forth in Rule 4 of the Federal Rules of Civil Procedure. Rule 4(h) provides for service upon corporations and associations, stating that service "shall be effected . . . (2) in a place not within any judicial district of the United States in any

---

**15.** *See id.*

**16.** *See* 5/16/05 Letter from George F. Hritz, counsel for CBK, to the Court.

**17.** *See* Kuwait's Reservations Declarations, http://hcch.e-vision.nl/inde x_en.php?act=status.commentcsid=434disp=resdn ("Reservations Declarations"). This 2005 filing date was corroborated by an inquiry from Charles H. Camp, Mones' counsel. In May 2005, Camp inquired with the Ministry as to whether Kuwait had filed any objections to the Convention, at which point the Ministry confirmed that Kuwait had not yet filed any formal objections to the Convention. *See* 5/23/05 Email from Cressida Alladin, Treaties Division, Legal Affairs Department, Ministry of Foreign Affairs for the Netherlands to Camp, Ex. F to Plaintiff's Reply Memorandum of Law in Support of Jurisdiction, at 3 ("'5/23/05 Ministry Email").

**18.** *See* Questionnaire Accompanying the Provisional Version of the New Practical Handbook on Operation of the Hague Convention *of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* ("Questionnaire"), Ex. D to 6/18/07 Declaration of Jeffrey D. Ratner, counsel for CBK ("Ratner Decl.").

**19.** *See* Replies of State of Kuwait to the Questionnaire Accompanying the Provisional Version of the New Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Responses"), Ex. E to Ratner Decl.

**20.** *See* 02/2004 Synopsis of the Replies to the Service Convention, http://hcch.e-vision.nl/upload/wop/lse_pd05.pdf ("Synopsis of Responses").

manner prescribed for individuals by subsection (f)." Under Rule 4(f), service may be effected outside the United States "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention[.]"

"The [Hague] Convention provides simple and certain means by which to serve process on a foreign national."[21] The Second Circuit has recognized that "[t]he Hague Convention provides for several alternate methods of service: (1) service through the Central Authority of member states; (2) service through consular channels; (3) *service by mail if the receiving state does not object;* and (4) service pursuant to the internal laws of the state."[22]

### B. Personal Jurisdiction

▪ To determine personal jurisdiction, a court engages in a two-part analysis. First, it must determine whether there is jurisdiction over the defendant under the relevant forum state's laws.[23] Second, it must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements.[24] "The burden of proving jurisdiction is on the party asserting it."[25]

▪ New York subjects a foreign corporation to general personal jurisdiction if it is "doing business" in the state.[26] Under this test, "a foreign corporation is amenable to suit in New York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction."[27] "[T]he term 'doing business' is used in reference to foreign corporations to relate to 'the ordinary business which the corporation was organized to do' .... It is not the occasional contact or simple collateral activity which is included."[28] "The doing business standard is a stringent one because a corporation which is amenable to the [c]ourt's general jurisdiction 'may be sued in New York on causes of action wholly unrelated to acts done in New York.'"[29]

▪ "For the purposes of the jurisdictional analysis under New York State law,

---

**21.** *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 706, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988).

**22.** *Burda Media, Inc. v. Viertel,* 417 F.3d 292, 300 (2d Cir.2005) (emphasis added) (citing Hague Convention Arts. 5, 6, 8, 9, 10). Courts are split on whether Article 10 of the Convention governs service of process, but in the Second Circuit, it does. *See Ackermann v. Levine,* 788 F.2d 830, 830 (2d Cir.1986). *See also Shoei Kako Co. v. Superior Court,* 33 Cal.App.3d 808, 821–22, 109 Cal.Rptr. 402 (1973) ("The reference to 'the freedom to send judicial documents by postal channels, directly to persons abroad' would be superfluous unless it was related to the sending of such documents for the purpose of service.") (quoting Hague Convention, 20 UST 361).

**23.** *See Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 242 (2d Cir.2007).

**24.** *See id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

**25.** *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994).

**26.** *See* N.Y. C.P.L.R. § 301 (codifying caselaw utilizing the "doing business" standard).

**27.** *Aerotel Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 191–92 (quoting *Frummer v. Hilton Hotels Int'l Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (1967)).

**28.** *Bryant v. Finnish Nat'l Airline,* 22 A.D.2d 16, 253 N.Y.S.2d 215, 219–20 (1st Dep't 1964) (internal citation omitted).

**29.** *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2001) (quoting *Ball v. Me-*

the [c]ourt focuses specifically on the [d]efendants' amenability to suit at the time the lawsuit was filed, not when the claim arose (and not subsequent changes in their status)." [30] To determine whether a foreign corporation is doing business in New York, courts focus on traditional criteria including: (1) whether the foreign corporation has an office in the state; (2) whether it has any bank accounts or other property in the state; (3) whether it has a phone listing in the state; (4) whether it does any public relations work in the state; and (5) whether it has employees who permanently work in the state.[31] No single criterion is determinative.[32] The general jurisdiction inquiry thus looks to the totality of the defendant's contacts and "permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." [33]

If a defendant is found to be "doing business" in the State, the court must then consider whether the exercise of jurisdiction will offend the Due Process clause under the Fourteenth Amendment, which permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has minimum contacts so long as the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." [34] To establish the necessary minimum contacts, the plaintiff must show that the defendant "purposefully availed" itself of the privilege of doing business in the State and thus could foresee being haled into court.[35]

## IV. DISCUSSION

### A. Service of Process

■■■■■ CBK claims that service of process was insufficient under Article 10(a) of the Convention because Kuwait had properly objected to service by mail pursuant to Article 21,[36] Article 21 of the Hague

---

*tallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 198 (2d Cir.1990)).

**30.** *Id.* at 726.

**31.** *See Wiwa v. Royal Dutch Petrol. Co.,* 226 F.3d 88, 98 (2d Cir.2000) (citations omitted).

**32.** *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 570 (2d Cir.1996) ("Contacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole."); *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) ("The Court must therefore analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York.' ") (quoting Weinstein, Korn & Miller, New York Civil Practice, ¶ 301.16, at 3–32).

**33.** *Metropolitan Life Ins. Co.,* 84 F.3d at 567–68 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

**34.** *International Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154.

**35.** *Chew v. Dietrich,* 143 F.3d 24, 28 (2d Cir. 1998).

**36.** It is first important to note that service by registered mail does not violate constitutional requirements. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (due process permits service of process by mail so long as such service provides "notice reasonably calculated ... to provide interested parties notice of the pendency of the action"). Many federal courts have upheld mail service under the Convention, but only if the States involved had not objected to mail service under Article 21. *See, e.g., Brockmeyer v. May,* 383 F.3d 798, 802–03 (9th Cir.2004) (finding that signatory countries to the Hague Convention "essentially unanimously" accept that Article 10(a) allows for service by mail, and that countries must lodge objections to Article 10(a) pursuant to Article 21 to avoid service by mail); *Research Sys. Corp. v. IPSOS Publicite,* 276 F.3d 914, 926 (7th Cir.2002) (holding that France had not objected to Article 10(a) pursuant to Article 21, and therefore mail was an acceptable method of service); *Ackermann,* 788 F.2d at 840; *Weight v. Kawa-*

Convention states in relevant part: "Each Contracting State shall similarly inform the Ministry, where appropriate, of—(a) opposition to the use of methods of transmission pursuant to articles 8 and 10 [at the time of ratification or accession, or at a later date]." [37] The Article does not define the term "inform" nor does it provide any guidance on the process by which States shall register their objections.

According to Kuwait, it informed the Ministry of its objection to service by mail on more than one occasion. CBK counsel testified via affidavit that in 2002, Kuwait passed a law explicitly objecting to mail service, and that Kuwait believed that it adequately informed the Ministry of this law at the time it signed the Convention. CBK concedes, however, that for unknown reasons the Ministry has no record of being so notified.

However, Kuwait again "informed" the Ministry of its objection to mail service via its responses to the Ministry's June 2003 questionnaire.[38] The cover page of the questionnaire directed all countries to submit their responses by a September 15, 2003 deadline, and there is no question that the Ministry received Kuwait's responses.[39] In February 2004, the Ministry posted, on its website, a summary of Kuwait's responses to the questionnaire.[40] Furthermore, on the Ministry's website, next to a link to a pdf file of Kuwait's responses, is the notation "Publication Year—2003." Nevertheless, when Mones' counsel inquired in May, 2005 as to whether Kuwait had filed any objection to Arti-

cle 10(a), he was told that it had not.[41] This was obviously inaccurate.

The fact is that Kuwait had informed the Ministry of its objection to mail service (possibly for the second time) more than two months before Mones served CBK via DHL.[42] While responses to a questionnaire are surely informal, they satisfy Article 21's requirement that countries "inform" the Ministry of their objections, if any, to the provisions of Article 10.

The nagging problem, however, is that Mones could not have known of Kuwait's objection at the time he made service by mail. The Ministry only published its synopsis of the answers to the questionnaire in February 2004, over a month after Mones effected service.[43] Moreover, the Ministry did not formally recognize Kuwait's objection to service of process by mail until June 29, 2005, when it updated the declaration page relating to Kuwait.[44]

Thus, this Court must decide whether to honor Kuwait's objection to Article 10(a) when, at the time of service, the objection was not published on the Convention's Declarations web-page for Kuwait and was not known by Mones. On the one hand, the purpose of requiring a signatory to inform the Ministry of any conditions on service is to alert parties who wish to serve a foreign government that is a signatory to the Hague Convention as to how to effect that service. Mones is clearly prejudiced if his lawsuit fails based on ineffective service. On the other hand, a court in the United States must balance the inter-

---

saki Heavy Indus., 597 F.Supp. 1082, 1085–86 (E.D.Va.1984); Chrysler v. General Motors, 589 F.Supp. 1182, 1206 (D.D.C.1984). But see Bankston v. Toyota Motor Corp., 889 F.2d 172, 174 (8th Cir.1989) (declining to interpret Article 10(a) as allowing for service of process by mail).

37. 20 U.S.T. 361.

38. See Responses.

39. See Questionnaire; Responses.

40. See Synopsis of Responses, at 1.

41. See 5/23/05 Ministry Email to Camp.

42. See Questionnaire at 1

43. See Synopsis of Responses.

44. See Reservations Declarations.

ests of its citizens in pursuing litigation against the interests of a sovereign state, and that balance tips in favor of deference to the sovereign state.[45] Kuwait informed the Ministry of its objection to service of process by mail on more than one occasion, and it did so prior to December 11, 2003, the date Mones served CBK. Thus, Mones' service of CBK by mail does not meet the service standards set forth in the Convention, nor of Rule 4(f) of the Federal Rules of Civil Procedure.

## B. Jurisdiction Under New York's Long Arm Statute

■ Although I have found that service of process was deficient, for purposes of completeness, I continue the personal jurisdiction analysis as if service were proper.

CBK claims that it was not doing "doing business" in the state of New York when it was served in December 2003, despite having two offices under lease, a full-time employee on staff to handle its liquidation and closure, phone and fax lines, and at least one bank account.[46] CBK's contacts in New York satisfy four of the five indicia courts typically consider when determining whether they have general personal jurisdiction over a defendant. Under the circumstances, CBK was "doing business" in New York at the time this proceeding began.[47]

■ It is true that on the date of service CBK had stopped performing regular banking operations in New York and was in the process of unwinding its business. However, that is not dispositive for jurisdictional purposes.[48] A foreign corporation does business in New York when the services provided by the New York office are of sufficient importance to the foreign corporation that they must be performed.[49] CBK was required by law to proceed through the liquidation process and it maintained an office in New York for this purpose. The value to CBK of maintaining a New York liquidation office was sufficiently high to warrant spending funds in

**45.** See Nelson v. Saudi Arabia, 923 F.2d 1528, 1531 (11th Cir.1991) ("Every sovereign State is bound to respect the independence of every other foreign State ...."); Smart v. State Farm Ins. Co., 868 F.2d 929, 932 (7th Cir. 1989) ("The idea of comity—of treating sovereigns, including such quasi-sovereigns as states and Indian tribes, with greater respect than other litigants counsels us to exercise forbearance in construing legislation to intrude upon the central regulatory functions of a sovereign entity.").

**46.** See Revlon, Inc. v. United Overseas Ltd., No. 93 Civ. 0863, 1994 WL 9657, at *2 (S.D.N.Y. Jan. 12, 1994) (holding that a foreign company that has a New York office, no matter how limited its purpose, is "doing business" in New York and is subject to personal jurisdiction); United Rope Distr., Inc. v. Kimberly Line, Kim–Sail Ltd., 770 F.Supp. 128, 133 (S.D.N.Y.1991) (holding that a foreign corporation, whose agent held a New York bank account on behalf of the corporation until five days after the lawsuit commenced, was deemed to have sufficient contacts to support a finding that it was "doing business" in New York).

**47.** See In re Ski Train, 230 F.Supp.2d 376, 383 (S.D.N.Y.2002) (holding that the court must consider the totality of the circumstances in making a personal jurisdiction determination, and noting that each alleged contact, standing alone, may not suffice to confer jurisdiction); International Housing, Ltd. v. Rafidain Bank Iraq, 712 F.Supp. 1112, 1118 (S.D.N.Y.1989), rev'd on other grounds, 893 F.2d 8 (2d Cir.1989) (holding that presence of bank accounts alone does not confer general jurisdiction).

**48.** See EFCO Corp. v. Nortek, Inc., No. 97 Civ. 1358, 1997 WL 466522 (S.D.N.Y. Aug. 13, 1997) (holding that the totality of the circumstances process of winding up the business in New York was enough to confer jurisdiction over the defendant).

**49.** See Tripmasters v. Hyatt Intern. Corp., 696 F.Supp. 925, 926 (S.D.N.Y.1988).

order to renew the lease at the end of February and keep the office running through March 31, 2004.

Simply because CBK was in liquidation does not exempt it from general personal jurisdiction.[50] Under New York law, maintaining an administrative office and paying employees to perform necessary functions is enough to confer general personal jurisdiction.[51] As a result, CBK's contacts with New York at the time of service satisfy both the "doing business" standard and the due process requirements under *International Shoe.*

### C. Subject Matter Jurisdiction

CBK claims this Court does not have subject matter jurisdiction because the Order of the District Court for the District of Columbia moots this case and collaterally estops Mones from collecting a judgment in this proceeding. *First,* that decision is not final as it is now on appeal. *Second,* the doctrine of collateral estoppel does not affect this Court's subject matter jurisdiction.

### V. CONCLUSION

Due to insufficient service of process, this Court does not have personal jurisdiction over CBK for purposes of these proceedings. The Clerk of the Court is directed to close this motion and this case, and the parties are directed to notify the

Court of Appeals immediately of this decision.

SO ORDERED.

---

50. *See In re Blair,* 99 F. 76, 78 (S.D.N.Y.1900) (holding that a partnership was doing business in New York during its liquidation). *Cf. Hopkins Fed. Sav. & Loan v. Cleary,* 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251 (1935) (holding that Wisconsin "building and loan associations" maintain their status as quasi public corporations, and are thus subject to strict supervision by state administrative agencies, both in course of doing business and in liquidation).

51. In *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965), the defendant airline maintained a one and a half room administrative office in New York, had a bank account here, and employed several people at the office who did public relations work, including maintaining contacts with other airlines. 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439. Although the office did not have the authority to carry out traditional airline business, such as confirming reservations or selling tickets, the court found sufficient indicia of doing business to establish general personal jurisdiction. *See id.*