ALLIANCE BOND FUND, INC., Alliance World Dollar Government Fund II, Inc., Alliance Global Dollar Government Fund, Inc., Elliot Associates, L.P., Avalon Total Return Fund, L.P., the Varde Fund, L.P., the Varde Fund II–A, L.P., the Varde Fund II–B, L.P., the Varde Fund III–A, L.P., the Varde Fund III–B, L.P. and the Varde Fund IV–A, L.P., Plaintiffs–Counter–Defendants–Appellees,

v.

GRUPO MEXICANO DE DESARROLLO, S.A., Desarrollo de Infraestructura, S.A. de C.V., Obras y Proyectos, S.A. de C.V., Desarrollo Urbano Integral, S.A. de C.V. and Desarrollo Industrial Latino–Americano, S.A. de C.V., Defendants–Counter–Claimants–Appellants.

No. 851, Docket 98–7549.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1998.

Decided Aug. 20, 1999.

Andrew J. Wertheim, Dale C. Christensen, Jr., New York, NY (Carolyn E. Bassani, Siobhan A. Handley, Orrick, Herrington & Sutcliffe LLP; John J. Galban, Seward & Kissel, on the brief), for Plaintiffs–Counter–Defendants–Appellees.

Scott S. Balber, New York, NY (Richard A. Mescon, Gerald M. Freedman, Morgan, Lewis & Bockius LLP, on the brief), for Defendants–Counter–Claimants–Appellants.

Before: WINTER, Chief Judge, and JACOBS and POOLER, Circuit Judges.

JACOBS, Circuit Judge:

Plaintiffs ("the noteholders") are United States investors who purchased notes issued by defendant Grupo Mexicano de Desarrollo, S.A. ("GMD"), one of several construction firms hired by private concessionaires that built Mexico's intercity toll roads in the early 1990s. Following defaults by the concessionaires on their debt to the construction firms, GMD defaulted on its notes. In 1997, the Government of Mexico implemented a Toll Road Rescue Program, by which it took control of the toll roads and in exchange promised to assume responsibility for the concessionaires' construction debt.

In this breach of contract suit, the United States District Court for the Southern District of New York (Martin, *J.*) (i) entered judgment in favor of the noteholders; and (ii) ordered GMD to "irrevocably assign or transfer" to the noteholders its rights under the Toll Road Rescue Program. On appeal, GMD contends that the order of assignment or transfer does not comport with New York's procedures for enforcing judgments.

We vacate the relief component of the judgment, and we remand to the district court for factfinding that bears on whether

the noteholders are entitled either to re-entry of that order or to some other relief.

## BACKGROUND

Between 1990 and 1994, GMD performed contracting work on a network of intercity toll roads being built pursuant to a program implemented by the Government of Mexico. Under the program, Mexico granted concessions to private companies ("the toll road concessionaires") that engaged construction firms to construct and operate the roads. GMD was also an investor in the concessionaires.

In 1994, the plaintiffs purchased notes that were issued by GMD and were guaranteed by four of its subsidiaries. (The subsidiaries are co-defendants; for ease of reference, the defendants are referenced collectively as GMD.)

Traffic on the toll roads proved disappointing, and the concessionaires stopped paying the construction companies, which were left with large unpaid invoices, referenced herein as "the toll road receivables." In June 1997, GMD disclosed that it was in serious financial difficulty. By August, it ceased making interest payments on the notes.

Under the Toll Road Rescue Plan, Mexico took control of the toll roads and promised in exchange to assume the responsibility for paying the debt that the toll road concessionaires incurred during the course of construction. The parties disagree as to how Mexico intends to implement this Plan. According to GMD, the government notes will be issued *to the concessionaires,* who will use the notes to pay debts owed to GMD (and others) evidenced by the toll road receivables. According to the noteholders, the government notes will be issued *to GMD* in exchange for its toll road receivables.[1]

---

1. In the appeal from the grant of a preliminary injunction in this case (discussed *infra*), the Supreme Court's recent opinion adopts the characterization urged by GMD. *See Gru-*

*po Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* —— U.S. ——, ——, 119 S.Ct. 1961, 1964, 144 L.Ed.2d 319, —— (1999).

In late 1997, GMD reported in a press release that it was settling debts with a number of Mexican creditors by assigning to them its right under the Toll Road Rescue Program to receive the government notes. The assignment was being effected by placing the toll road receivables in "trust" for the benefit of the creditors, with the understanding that the receivables someday would be exchanged for government notes.

On December 11, 1997, the noteholders accelerated the principal amount of the notes. The next day, they filed this breach of contract suit seeking among other things a money judgment for the principal in default, plus interest.

Soon after, the district court granted a preliminary injunction restraining GMD from "dissipating, disbursing, transferring, conveying, encumbering or otherwise distributing or affecting" its "right to, interest in, title to or right to receive or retain[ ] any of the Government Notes." In entering the preliminary injunction, the district court required the noteholders to post a $50,000 bond.

This Court affirmed the entry of the preliminary injunction on May 6, 1998. *See Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688 (2d Cir.1998). The Supreme Court granted a writ of certiorari on November 30, 1998. *See Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, —— U.S. ——, 119 S.Ct. 537, 142 L.Ed.2d 447 (1998).

While the preliminary injunction was in force, the noteholders moved for summary judgment, and for an order directing GMD to "irrevocably assign or transfer" to them a sufficient amount of toll road receivables or government notes (together, "the as-

sets") to satisfy the judgment or, in the alternative, an order converting the preliminary injunction into a permanent injunction.

On April 17, 1998, the district court (i) granted the noteholders' motion for summary judgment; (ii) awarded judgment in the amount of $82,444,259; (iii) directed GMD to "irrevocably assign or transfer" to the noteholders a sufficient amount of toll road receivables or government notes to satisfy the judgment; and (4) converted the preliminary injunction into a permanent injunction to remain in effect until the assignment or transfer of the toll road receivables and government notes was accomplished. The same day, the district court entered judgment in accordance with its order.

██ In its notice of appeal, GMD challenged both (i) the district court's conversion of the preliminary injunction into a permanent injunction ("the permanent injunction"); and (ii) so much of the district court's judgment as ordered the assignment or transfer to the noteholders of the toll road receivables and government notes ("the turnover order"). GMD's briefs on appeal, however, do not press the appeal from the permanent injunction, and that portion of the appeal is therefore abandoned.

On June 17, 1999, the Supreme Court held that the district court had lacked the authority to issue the preliminary injunction. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, —— U.S. ——, ——, 119 S.Ct. 1961, 1975, 144 L.Ed.2d 319, —— (1999).

We begin our analysis with GMD's assertion that the Supreme Court's preliminary injunction ruling requires reversal of the turnover order.[2]

---

**2.** GMD made this argument in its opposition to the noteholders' request for an order granting leave to the district court to "clarify" the permanent injunction. GMD's opposition also argued that the permanent injunction "should be altered to provide that the Toll

Road Receivables and Government Notes must be removed from its purview."

In an order dated July 26, 1999, this Court (i) granted the district court leave to adopt the changes proposed by the noteholders; (ii) construed GMD's opposition as a cross-motion for an order granting leave to the district

## DISCUSSION

### A. The Supreme Court's Preliminary Injunction Holding.

▇ Although GMD concedes that the "permanent injunction itself is of course valid," it argues that reversal of the turnover order is necessary because, absent the unauthorized preliminary injunction, the toll road receivables and government notes would have been unavailable for satisfaction of the judgment.

GMD cites no case in support of its argument, and we reject it. As the noteholders explain, the Supreme Court's holding does nothing more than give GMD a potential cause of action against the injunction bond. See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1054 (2d Cir.1990) ("[T]he theory underlying [Rule 65(c) is] that the applicant [for the injunction] consent[s] to liability up to the amount of the bond, as the price for [the injunction]." (internal quotation marks omitted)); see also W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber Workers, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond.").[3]

### B. New York Law.

#### 1. The C.P.L.R.

Under Federal Rule of Civil Procedure 69(a), "[p]rocess to enforce a judgment for the payment of money shall be a writ of execution," and "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure *of the state in which the district court is held,* existing at the time the remedy is sought" (emphasis added). The question is therefore whether the district court, in issuing the turnover order, acted in accordance with New York's procedures for the enforcement of judgments.

New York procedure for enforcement of judgments is set out in Article 52 of the Civil Practice Law and Rules ("C.P.L.R."). The first section of Article 52 describes the assets that New York law has made subject to enforcement, and thus available to judgment creditors. See C.P.L.R. § 5201; David D. Siegel, *General Commentary on Article 52* at 49 (McKinney 1997) (hereinafter *General Commentary*); see also *Marshak v. Green,* 746 F.2d 927, 930 (2d Cir.1984) ("Those courts which have considered the issue have determined that state law also determines the type of property which can be subject to execution."). Different subsections control depending on whether the money judgment is to be enforced against a debt or against other property:

(a) **Debt against which a money judgment may be enforced.** A money judgment may be enforced against *any debt, which is past due or which is yet to become due,* certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or non-resident, unless it is exempt from application to the satisfaction of the judgment. A debt may consist of a cause of action which could be assigned or transferred accruing within or without the state.

(b) **Property against which a money judgment may be enforced.** A money judgment may be enforced against *any property which could be assigned or transferred,* whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment. . . .

C.P.L.R. § 5201 (emphasis added).

The remaining provisions of Article 52 "supply[ ] the devices whereby to reach" a

---

court to alter the permanent injunction to remove certain assets from its purview; and (iii) denied the cross-motion subject to any further mandate of this Court.

**3.** Nor are we persuaded by GMD's judicial estoppel argument.

particular asset. *General Commentary, supra,* at 49. In this appeal, the parties focus on C.P.L.R. §§ 5225 and 5227, which specify the devices for implementing what is known as a "delivery" or "turnover" order.[4] Sections 5225 and 5227 provide a particular collection device for each of three categories of assets: (i) debts owed to the judgment debtor; (ii) property owned by and in the possession of the judgment debtor; and (iii) property owned by the judgment debtor but in the possession of someone other than the judgment debtor.

Under § 5227, a judgment creditor seeking to collect a *debt* that is owed to the judgment debtor must proceed against the person who owes the debt: the judgment debtor's debtor. *See* C.P.L.R. § 5227. In such a proceeding, "the court may require [the judgment debtor's debtor] to pay to the judgment creditor the debt upon maturity." *Id.*

*Property,* on the other hand, can be reached in one of two ways. Under § 5225(a), a judgment creditor pursuing property in the possession of the *judgment debtor* must seek a court order requiring the judgment debtor to turn it over. Under § 5225(b), a judgment creditor pursuing property in the possession of someone *other* than the judgment debtor must commence an action against the person in possession.

Although New York law draws a line between a debt owed to a judgment debtor and property owned by the judgment debtor but in the possession of another, that line can at times "become[ ] too fine to distinguish." David D. Siegel, *Practice Commentaries* § C5225:5 (McKinney 1997) (hereinafter *Practice Commentaries*). For that reason, the first and third categories are "close in both function and procedure." *Id.* In both instances, the third party against whom the judgment creditor must proceed is the "garnishee." David D.

Siegel, *New York Practice* § 491, at 755 (2d ed.1991) (hereinafter *New York Practice* ).

In effect, §§ 5225 and 5227 require the judgment creditor to proceed against the party that can produce the asset that the judgment creditor seeks, whether that party is the judgment debtor itself, or some third party. This requirement allows for the possibility that there may be other claimants of the debt or the property, or other interests in it, assertable by the garnishee on its own behalf, or by fourth parties that are impleaded or who intervene. *See* § 5225(b) (stating that, in a proceeding commenced by the judgment creditor against a party in possession of the judgment debtor's money, "where it is shown that the judgment debtor is entitled to the possession of such property . . ., the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor"); *Practice Commentaries, supra,* § C5225:5 ("[A]ny person claiming an interest in the property [that is the subject of the special proceeding against the garnishee] may intervene [in the proceeding]."); *Practice Commentaries, supra,* § C5227:1 ("If there is any possibility that the debt is owed to someone other than the judgment debtor, the garnishee (the respondent in the proceeding) must assure that the judgment debtor as well as any third person claimant is made a party . . . .").

A judgment creditor seeking a turnover order therefore must show: First, that the asset it seeks to collect has been made available to judgment creditors by § 5201; and second, that the party against which the creditor has chosen to proceed has the ability to produce the asset. For the reasons that follow we conclude that the noteholders so far have failed to make either showing.

---

4. The parties appear to agree that under Rule 69(a), §§ 5225 and 5227 are applicable in federal court. *See also HBE Leasing Corp. v.*

*Frank,* 48 F.3d 623, 633 (2d Cir.1995) (stating that § 5225(b) is made "applicable in the District Court via Fed.R.Civ.P. 69(a)").

In attacking the turnover order, GMD characterizes the toll road receivables at issue here as debt, simply money owed to it, either by the toll road concessionaires who have not yet paid for GMD's construction services, or by the Government of Mexico, which has promised to pay that debt on behalf of the toll road concessionaires. To collect the amount of money that the toll road receivables represent, GMD argues, § 5227 requires the noteholders to proceed against the Mexican Government. (The parties seem to agree that the toll road concessionaires are judgment-proof.) Similarly, as to the government notes, GMD argues that they are no more than evidence that Mexico owes GMD a sum of money, and it maintains that, in order to reach that money, the noteholders must proceed against the Mexican Government.

GMD thus concedes that the disputed assets are subject to enforcement under § 5201(a)'s definition of "[d]ebt against which a money judgment may be enforced." But that concession is of no benefit to the noteholders because the characterization of the disputed assets as debt will almost certainly place the assets out of reach: the Mexican Government is not a party to this action, and it may never be made a party. Therefore, if we conclude that under New York law the noteholders can obtain a turnover order only by proceeding against Mexico, it follows that the noteholders are unlikely to be able to obtain the relief that they seek in the forum in which they have chosen to proceed.

According to the noteholders, both the toll road receivables and the government notes should be classified under § 5201(b) as "[p]roperty against which a money judgment may be enforced." The noteholders further maintain that this property is in the possession of GMD, and therefore that under § 5225(a), the district court properly directed the turnover order to GMD, as opposed to the Mexican Government. In this view, each toll road receivable is a right to receive the notes that have been promised to GMD by Mexico, and each entitles the *bearer* to a certain number of government notes, irrespective of whether the bearer on the date of issuance is GMD, the noteholders, or someone else. As to the government notes, the noteholders characterize them as the equivalent of money and, therefore, of property—again, property in the hands of GMD.

On the current record, we lack sufficient information to choose between the competing characterizations promoted by the parties. The district court received no evidence and made no findings concerning either the nature of Mexico's promise to exchange government notes for toll road receivables or the financial characteristics of those government notes. On appeal, no party has drawn our attention to the text of either the Toll Road Rescue Program or the government notes—both of which are presumably written in Spanish. We are therefore unable to determine whether the district court's issuance of the turnover order accorded with New York law.

### 2. The Effect of ABKCO.

■ The noteholders argue that the turnover order can be affirmed (at least) as to the assignment or transfer of the toll road receivables without a prior characterization of the receivables as either property or debt. The noteholders' argument runs as follows:

· As GMD's 1997 Annual Report discloses, there is no guarantee that the Mexican Government will ever make good on the promises it made when enacting the Toll Road Rescue Program.

· So even if the receivables are properly characterized as debt owed to GMD by the Mexican Government, that debt is neither "past due" nor "to become due, certainly or upon demand," and it therefore does not meet § 5201(a)'s

definition of "[d]ebt against which a money judgment may be enforced."[5]

· Since the toll road receivables are not "*[d]ebt* against which a money judgment may be enforced," they must be "*[p]roperty* against which a money judgment may be enforced." C.P.L.R. § 5201 (emphasis added).

In aid of that argument, the noteholders rely on *ABKCO Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 385 N.Y.S.2d 511, 350 N.E.2d 899 (1976), in which the Court of Appeals concluded that a judgment creditor could attach the interest of an English debtor in the proceeds of its contract with a New York resident.[6] The English debtor was a film producer that had licensed its film to a New York promoter in exchange for 80 percent of the net profits. *See id.* at 673, 385 N.Y.S.2d at 512, 350 N.E.2d 899. At the time of suit, however, no proceeds had materialized, and there was no guarantee that any ever would. *See id.* at 674, 385 N.Y.S.2d at 512–13, 350 N.E.2d 899. "The film might fail, for example, and produce no profits at all." *Practice Commentaries, supra,* § 5201:5. The debtor and the New York promoter—the putative garnishee—argued that the proceeds of the license were not subject to attachment because the obligation to pay was not yet "past due," nor was it "to become due, certainly or upon demand," and that therefore the obligation did not meet § 5201(a)'s definition of a "[d]ebt against which a money judgment may be enforced." *See ABKCO,* 39 N.Y.2d at 674, 385 N.Y.S.2d at 512–13, 350 N.E.2d 899.

The Court of Appeals held that the debtor's right under the licensing agreement was subject to attachment not as debt, but as "[p]roperty against which a money judgment may be enforced," and that, at least with respect to "[p]roperty against which a money judgment may be en-

forced," New York law contains "no threshold requirement that the attaching creditor show the value of the attached property or indeed that it has any value." *Id.* at 675, 385 N.Y.S.2d at 514, 350 N.E.2d 899.

Citing *ABKCO*, the noteholders argue that in determining whether a particular asset has been made subject to enforcement by New York law, courts should eschew a technical analysis of whether the asset is debt or property, and should instead focus on whether the asset has economic potential:

> Under [the Toll Road Rescue Program, GMD] ha[s] interests or rights in the Government Notes evidenced by [its] Toll Road Receivables. These interests or rights, while uncertain as to amount, are similar to the bundle of rights under the contract in *ABKCO*. *ABKCO*, therefore, permits Plaintiffs to treat these assets as property.

Brief for Plaintiffs–Counter–Defendants–Appellees at 30.

The holding in *ABKCO* is potentially relevant to the noteholders' attempt to obtain cash in satisfaction of the judgment. *ABKCO* virtually erases the distinction in § 5201 between "debt" and "property" by re-characterizing—as "[p]roperty against which a money judgment may be enforced"—debts that otherwise are placed out of reach by § 5201(a)'s requirement that the debt being pursued be either past due or certain to become due upon demand. By so doing, *ABKCO* undertakes to elide "arbitrary distinctions": "If from the judgment creditor's point of view the asset is worth pursuing as a matter of economics, *ABKCO* authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the chase." *Practice Commentaries, supra,* § 5201:5. Accordingly, if (as

---

5. The Investors also contend that the toll road receivables cannot constitute "[d]ebt against which a money judgment may be enforced" because their value is uncertain.

6. Pursuant to C.P.L.R. § 6202, "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment."

GMD's 1997 Annual Report seems to indicate) the toll road receivables do not meet § 5201(a)'s definition of "[d]ebt against which a money judgment may be enforced," then it may be that under *ABKCO,* those assets are nevertheless subject to enforcement as "[p]roperty against which a money judgment may be enforced" within the meaning of § 5201(b). *But see In re Supreme Merchandise Co., Inc. v. Chemical Bank,* 70 N.Y.2d 344, 350–51, 520 N.Y.S.2d 734, 736–37, 514 N.E.2d 1358 (1987).

But *ABKCO* does not allow us to affirm the turnover order, because it does not resolve the two issues that are essential to the resolution of this appeal: First, whether the toll road receivables have been made available to judgment creditors by § 5201; and second, whether GMD has the ability to produce what the noteholders seek-the money that Mexico has promised to pay in exchange for taking over the toll roads.

### (a) *Whether the Toll Road Receivables Have Been Made Available to Judgment Creditors.*

Pursuant to § 5201(b), a money judgment can be enforced only against that property "which could be assigned or transferred." Thus, under § 5201(b), only those property interests of the judgment debtor "which by law the debtor may assign or transfer, may be sought for application to the judgment." *New York Practice, supra,* § 486, at 742; *see*

also *Marshak v. Green,* 746 F.2d 927, 931 (2d Cir.1984); *ABKCO,* 39 N.Y.2d at 674, 385 N.Y.S.2d at 513, 350 N.E.2d 899 ("We conclude that [the debtor's rights under the contract] constituted property.... *That property was attachable because concededly it was assignable by [the debtor].*" (emphasis added)).

One question is whether the toll road receivables are assignable or transferrable when viewed solely as obligations of the concessionaires. Another question is whether the toll road receivables are assignable or transferrable when they are viewed in their capacity as evidence of the right to receive government notes. The record does not suggest answers, nor does it contain a basis for concluding that the right to receive government notes extends to or is enforceable by a holder other than a Mexican person or firm. The Government of Mexico is assuming obligations for one or more of several policy reasons that on this record are conceivable but unknown. It is at least possible that the Toll Road Rescue Program will operate as a bail-out for participants in the Mexican economy and that the Mexican Government will agree to exchange the promised government notes only for toll road receivables held by a Mexican company, person or firm.[7] If so, then—even assuming that under *ABKCO* the receivables qualify—they may be neither assignable nor transferrable, and therefore may not be made subject to enforcement by § 5201(b).[8]

---

7. Similarly, Mexico might decide to make payments on the government notes only to a Mexican company, person or firm.

8. For the same reason, on the current record, we are forced to reject the district court's apparent conclusion (advanced on appeal by the noteholders) that the turnover order was properly issued because it does not do violence to the policies underlying §§ 5225 and 5227 of the C.P.L.R. The district court began by stating (correctly) that those sections are designed to allow for the possibility that a garnishee might have a defense to collection. From there, the court appeared to reason that, because the turnover order does not

require Mexico to pay the noteholders directly (but instead requires GMD to assign to the noteholders whatever right it has to receive money from Mexico), it follows that the turnover order does not interfere with Mexico's ability to act on any defense to collection it may have.

As discussed in the text, it is at least possible that the toll road receivables are neither assignable nor transferrable, or that, by assigning or transferring them, GMD will render them valueless, both to it and to the noteholders. Accordingly the turnover order may not conform to § 5201(b) ("A money judgment may be enforced against *any proper-*

**(b)** *Whether the Toll Road Receivables Are Property in the Possession of GMD.*

The noteholders also cite *ABKCO* to support their position that they can obtain the money that will be made available by the Toll Road Rescue Program by forcing GMD to turn over the receivables rather than by proceeding against the Mexican Government. They reason that if *ABKCO* allows an asset to be treated as property for the purposes of § 5201, *ABKCO* must also allow the asset to be treated as property for the purposes of seeking a turnover order, even if the nature of the asset is such that under any other circumstance it would be considered debt.

We decline the invitation to hold that an asset characterized as property for the purposes of § 5201 is necessarily characterizable as property for purposes of §§ 5225 and 5227 as well. The *ABKCO* opinion reflects an intention to bring within the reach of judgment creditors assets that previously had been placed out of reach by § 5201(a)'s limiting reference to "[d]ebt against which a money judgment may be enforced." *ABKCO* does not question or touch on the mechanical and policy considerations that support the debt/property distinction observed in §§ 5225 and 5227. Those sections are structured as they are in order to accommodate any defense to collection that a garnishee may have. We do not read *ABKCO* to change the practical and conceptually sound requirement, under §§ 5225 and 5227, that

in order to obtain a turnover order, the judgment creditor must proceed against the person having the ability to produce the asset.

■ This conclusion is supported by the text of *ABKCO*. After holding that the debtor's interest in the proceeds under the license was subject to attachment under New York law, the Court of Appeals considered whether New York's courts— which lacked personal jurisdiction over the English debtor—could issue the order of attachment. Answering the question in the affirmative, the court reasoned that the attachment order was proper because jurisdiction did exist over the garnishee— the party "upon whom rest[ed] the obligation of performance." *ABKCO*, 39 N.Y.2d at 675, 385 N.Y.S.2d at 513, 350 N.E.2d 899.[9]

\*       \*       \*

The holding in *ABKCO* therefore does not furnish a ground for affirming the turnover order.

**C.  Other Arguments.**

Finally, the noteholders urge that the turnover order should be affirmed even if it does not comport with New York law because the district court had the equitable power to craft an enforcement device that deviates from that available under state law.[10]

On remand, the district court might conclude that the turnover order is authorized

---

*ty which could be assigned or transferred ....*" (emphasis added)).

**9.**  The noteholders contend that this portion of *ABKCO* is "irrelevant" because "attachment is not an issue here." We disagree. True, attachment was at issue in *ABKCO*, whereas this appeal addresses the propriety of a turnover order. However, a judgment creditor seeking to enforce a judgment in a New York court must establish that the asset sought has a New York situs. *See New York Practice, supra*, § 487, at 747 ("It is often important, when dealing with an intangible property interest, to fix its situs, since it can be dealt with by a New York court only if found to have in

some sense a New York situs."). With respect to intangible property rights, "[f]inding the garnishee is just another way of finding the asset's 'situs'" because "if the garnishee has a New York presence, the debtor's asset in his hands probably has a New York situs, too." *Id.* § 491, at 756.

**10.**  The noteholders have not argued that they can obtain the relief they seek by way of the creditor's bill—the equitable action that was the subject of the Supreme Court's opinion in the appeal from the preliminary injunction. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, — U.S. —, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

by New York law. We therefore decline to consider this argument, and leave it to the district court, to consider only in the event that it becomes necessary to do so. We note, however, that if the court finds that the turnover order is not authorized by New York law, then, even assuming that it has the power to craft enforcement procedures that deviate from state law (a finding which we do not make), the exercise of that power becomes an issue of prudence.

\*     \*     \*

In summary, on the basis of the current record, we are unable to determine whether in issuing the turnover order the district court acted in accordance with New York's procedures for enforcing a judgment. If, as the noteholders maintain, (i) the toll road receivables entitle the *bearer* to a certain number of government notes, regardless of whether the bearer is a Mexican company or citizen, and (ii) the government notes are the equivalent of money (and therefore have value irrespective of who possesses them), then the noteholders are likely correct in their assertion that C.P.L.R. § 5225(a) entitles them to an order requiring GMD to surrender its hold on both the receivables and on those notes that it has in its possession. On the other hand, if the toll road receivables and/or the government notes constitute nothing more than evidence of debt, then GMD likely has the better of this dispute: under C.P.L.R. § 5227, the noteholders must proceed directly against the Mexican Government.

### CONCLUSION

We vacate the judgment to the extent that it ordered GMD to "irrevocably assign or transfer to [the noteholders] ... a sufficient amount of toll road [r]eceivables or [g]overnment [n]otes to satisfy th[e] judgment." The action is remanded to the district court for factfinding on the question of whether the noteholders are entitled either to re-entry of that order or to some other relief. Because we have vacat-

ed the turnover order, we also vacate the stay of that order, which was entered pending appeal.

We previously denied (subject to any further mandate of this Court) GMD's cross-motion for an order granting leave to the district court to alter the permanent injunction to remove certain assets from its purview. *See supra* note 2. By way of further mandate, we rule that the denial is without prejudice, and therefore that the request can be the subject of a motion to the district court.