**Bruce E. MONES, Petitioner,**

v.

**COMMERCIAL BANK OF KUWAIT, S.A.K., Respondent.**

No. 18 MISC. 0302(SAS).

United States District Court, S.D. New York.

July 12, 2005.

Charles Camp, Law Offices of Charles H. Camp, Washington, DC, for Petitioner.

George F. Hritz, Hogan & Hartson, L.L.P., New York City, for Respondent.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Petitioner Bruce E. Mones has moved for a finding of contempt against respondent Commercial Bank of Kuwait, S.A.K. ("CBK"). Mones alleges that CBK's failure to comply with this Court's December 23, 2003 Turnover Order constitutes contumacious conduct. Accordingly, Mones requests an order requiring CBK to pay: "(1) the amount owed to him under a prior Judgment by CBK depositors ...; (2) $1,000 per day since May 24, 2004, when CBK received Mr. Mones' written pay-

ment instructions pursuant to the Turnover Order, until CBK has complied with the Turnover Order; and (3) reasonable attorney's fees and expenses incurred in seeking compliance with the Turnover Order, including the briefing, and if applicable, argument of this Motion for Contempt."[1] For the following reasons, Mones's motion for contempt is denied and the Turnover Order is vacated.

## II. BACKGROUND

On June 18, 2003, Mones obtained a judgment from the United States District Court for the District of Columbia against the Limited Partner Judgment Debtors.[2] The "judgment was registered and made a judgment of this Court on August 19, 2003."[3]

Pursuant to the judgment, on September 17, 2003, restraining notices were issued and served on CBK at both its New York and Kuwait offices.[4] Under the judgment, Mones is entitled to receive funds on deposit with CBK belonging to the Limited Partner Judgment Debtors which are necessary to fully satisfy the judgment against them.[5] Accordingly, "the restraining notices prohibit respondent from transferring any property (including money) in which the Limited Partner Judgment Debtors have any interest."[6]

On December 4, 2003, Mones filed a Notice of Petition of Issuance of Order for Payment or Delivery of Property of Judgment Debtors in the Possession of CBK ("Petition for Turnover Order").[7] On December 11, 2003, the Petition for Turnover was served directly upon CBK at its main office in Kuwait via DHL.[8]

At a December 23, 2003 hearing on Mones' Petition for a Turnover Order, this court granted the petition against CBK.[9] Thereafter, the Clerk of Court mailed a copy of the Turnover Order to all parties,

---

1. Petitioner's Memorandum of Law in Support of Motion for Contempt ("Pet.Mem.") at 10.

2. See Turnover Order, Ex. 2 to Pet. Mem. at 1. The Limited Partner Judgment Debtors are comprised of all of the limited partners of limited partnership Special Situation Investment Holdings, Ltd. and Special Situation Investment Holdings, L.P. II, including, Astrolabe General Trading & Contracting Co.; A1 -Nabah General Trading Co. W.L.L.; Salah Mohammed Ali Wazzan, Hamad M. Al Wazzan; Safir International Hotel Management; M/S/M W.L.L; Mohammed Ali Naki; Financial Group of Kuwait KSC; Dana Investment C.V.; Anoroc Limited; Securities Group Co. KSC; Kuwait Portland Cement Co. K.S.C.; Adel Yaquob Al Ghanim; Ali M.T. Alghanim and Fouad M.T. Alghanim; Sheikh Ali Salem Ali Ali Salem Al Sabah; and Sheikh Ahmad Yousef Soud Al Sabah. See id.

3. Id. See also Respondent's Memorandum in Opposition to Petitioner's Motion for Contempt ("Opp.Mem.") at 3.

4. See Turnover Order. CBK is headquartered in Kuwait and had a branch office in New York until June 30, 2003. CBK alleges that as of that date it ceased all banking operations pursuant to a voluntary liquidation under 12 U.S.C. §§ 182 and 3102. See Opp. Mem. at 3.

5. See Turnover Order at 2. Petitioner alleges that CBK ceased all banking operations no earlier than February 14, 2004—two months after the Turnover Order was issued. See Petitioner's Reply to Respondent's Opposition Memorandum ("Reply Mem.") at 3.

6. Turnover Order at 2.

7. See id.

8. See Proof of Service from DHL, Ex. 1 to Pet. Mem. CBK contests the validity of the service in Kuwait under the Hague Convention; however I need not reach this issue because, even assuming service was proper, the Turnover Order was invalid as this Court lacks the power to order CBK to transfer assets from outside the jurisdiction.

9. See Turnover Order; see also Pet. Mem. at 2; Opp. Mem. at 4.

including CBK, at both its New York and Kuwait offices.[10]

On January 23, 2004, petitioner's counsel alleges that he wrote to the then-manager of CBK's New York branch, Ms. Elham Y. Mahfouz, as well as to CBK's New York-based counsel at Gibson Dunn & Crutcher.[11] The letter requested a response regarding whether CBK intended to comply with the Turnover Order.[12] In addition, a copy of the Turnover Order was included.[13] Mones' counsel received no response to his inquiry.[14]

On May 24, 2004, petitioner's counsel sent another letter to CBK's Chairman & Managing Director, as well as the Chief General Manager & CEO in Kuwait. The letter contained formal payment instructions and demanded payment of the funds necessary to satisfy the judgment.[15] On May 27, 2004, the then-Head of Legal & LTO Division in Kuwait, Dr. Ibrahim Makarem, responded to Mones' counsel.[16] The letter represented that because CBK's New York branch office had closed, no jurisdiction existed under which the court could issue a valid order.[17] Accordingly, Dr. Makarem deemed the court order "ultra vires" and stated that CBK "is not responsible for the execution of said order."[18]

In a detailed letter dated May 27, 2004, Mones' counsel responded to CBK's claim that the court lacked jurisdiction.[19] The letter explained that the Turnover Order was in no way altered by the closing of CBK's New York branch. This was particularly true in light of the fact that CBK's Kuwait office was personally served with the Petition for Turnover.[20] Mones' counsel did not receive a response to his letter.[21]

On January 10, 2005, Mones' counsel served a Request for Admissions upon CBK, asking it to admit the following:

1. Admit that CBK has failed to comply in any respect with the Turnover Order, even though CBK has been fully aware of the Turnover Order since at least January 1, 2004.

2. Admit that CBK has failed to comply in any respect to the Written Payment Instructions, even though CBK received the Written Payment Instructions on or about May 24, 2004.

3. Admit that CBK has been in possession of funds of each of the Limited Partner Judgment Debtors ... at one or more times since September 17, 2003, when the Restraining Notice was served upon CBK.

4. Admit that CBK has failed to comply in any respect with the Restraining Notice.[22]

10. *See* Pet. Mem. at 4.

11. *See id.;* 1/23/04 Letter to Ms. Mahfouz ("Mahfouz Letter"), Ex. 3 to Pet. Mem.

12. *See* Mahfouz Letter.

13. *See id.*

14. *See* Pet. Mem. at 4.

15. *See id.;* 5/24/04 Letter to Sheikh Ahmad Salem Al Ali Al Sabah, Ex. 4 to Pet. Mem.

16. *See* Pet. Mem. at 4–5; 5/27/04 Letter from Dr. Ibrahim Makarem ("Makarem Letter"), Ex. 5 to Pet. Mem.

17. *See* Makarem Letter.

18. *Id.*

19. *See* Pet. Mem. at 5; 5/27/04 Response Letter to Dr. Makarem ("Makarem Resp. Letter"), Ex. 6 to Pet. Mem.

20. *See* Makarem Resp. Letter.

21. *See* Pet. Mem. at 5.

22. Request for Admissions, Ex. 7 to Pet. Mem. at 4. *See* Opp. Mem. at 4–5.

In a response dated January 27, 2005, CBK's Acting Head of Legal & LTO Department confirmed receipt of the Request for Admissions. The letter also informed Mones' counsel that CBK did not consider itself a party to the dispute because petitioner lacked jurisdiction to seek funds from the stakeholder bank. Accordingly, CBK objected to the Request for Admissions.[23] Mones' counsel responded to these statements in his letter of February 2, 2005. Counsel advised CBK that its "refusal to respond to the Request for Admissions would result in CBK admitting each of the matters sought by Mones in the Request for Admissions." [24] Mones' counsel then requested that CBK contact him in order to resolve the matter amicably.[25] Mones' counsel did not receive a response to his February 2, 2005 letter.[26]

Mones now moves for an order of contempt against CBK. In support of his motion, petitioner argues that CBK, in violation of the Turnover Order, has repeatedly failed to distribute to him any funds it may hold that are owned by the Limited Partner Judgment Debtors.[27] CBK opposes the motion arguing, first, that the Court had no personal jurisdiction over CBK because CBK's New York branch was liquidated before the entry of the judgment in the Southern District of New York and second, that this Court lacked authority under New York law to direct a financial intermediary to transfer to Mones assets whose situs is outside the jurisdiction of the Court.

## III. LEGAL STANDARDS

### A. Personal Jurisdiction

New York subjects a foreign corporation to general jurisdiction if it is "doing business" in the state.[28] Under this test, "a foreign corporation is amenable to suit in New York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." [29] "[T]he term 'doing business' is used in reference to foreign corporations to relate to 'the ordinary business which the corporation was organized to do.... It is not the occasional contact or simple collateral activity which is included.' " [30] "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York." [31]

"For the purposes of the jurisdictional analysis under New York State law, the Court focuses specifically on the Defendants' amenability to suit at the time the lawsuit was filed, not when the claim arose (and not subsequent changes in their status)." [32] To determine whether a foreign corporation is doing business in New

---

23. *See* 1/27/05 Letter from Mr. Essam Abo Al Fadel, Ex. 8 to Pet. Mem.; Opp. Mem. at 5.

24. 2/3/05 Response Letter to Mr. Essam Abo Al Fadel, Ex. 9 to Pet. Mem.

25. *See id.*

26. *See* Pet. Mem. at 7.

27. *See id.* at 1.

28. *See* New York Civil Practice Law & Rules ("CPLR") § 301 (codifying caselaw that utilizes "doing business" standard); *Aerotel Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189, 191 (S.D.N.Y.2000) (interpreting CPLR § 301).

29. *Aerotel*, 100 F.Supp.2d at 191–92 (quoting *Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (1967)).

30. *Bryant v. Finnish Nat'l Airline*, 22 A.D.2d 16, 253 N.Y.S.2d 215, 219–20 (1st Dep't 1964) (internal citation omitted).

31. *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 731 (S.D.N.Y.2001).

32. *Id.* at 726 n. 5.

York, courts have focused on a traditional set of indicia: (1) whether the company has an office in the state; (2) whether it has any bank accounts or other property in the state; (3) whether it has a phone listing in the state; (4) whether it does any public relations work there; and (5) whether it has individuals permanently located in the state to promote its interests.[33] No single criterion is determinative.[34]

## B. Motion for Contempt

■ The Supreme Court has held that " 'the power to punish for contempt is inherent in all courts.' "[35] " '[T]he underlying concern that gave rise to the contempt power was not … merely the disrupting of court proceedings … [but] disobedience to the orders of the court.' "[36] Accordingly, the court's power to punish for contempt " 'reaches both conduct before the court and that beyond the court's confines.' "[37] Contempt orders are often utilized " 'to enforce compliance with an order of the court or to compensate for losses or damages.' "[38] Nonetheless, the power should not be misused. In fact, "[t]he Supreme Court has warned against sanctioning a party for contempt 'where there is a fair ground of doubt as to the wrongfulness of the party's conduct.' "[39]

■ "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."[40] However, "the right to remedial relief falls with an injunction which events prove was erroneously issued."[41]

## IV. DISCUSSION

### A. Personal Jurisdiction

■ The Court need not reach the question of personal jurisdiction because, even if the Court had jurisdiction over CBK, the Court cannot reach assets held by a financial intermediary outside its jurisdiction. Moreover, whether or not the Court has personal jurisdiction over CBK cannot be

33. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 98 (2d Cir.2000) (citations omitted).

34. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 570 (2d Cir.1996) ("Contacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole."); *Landoil Res. Corp. v. Alexander & Alexander, Services, Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) ("The Court must therefore analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York.' ").

35. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Ex parte Robinson,* 19 Wall. 505, 86 U.S. 505, 22 L.Ed. 205 (1873)).

36. *Id.* (quoting *Young v. U.S. ex rel Vuitton et Fils S.A.,* 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)).

37. *Id.* (quoting *Young,* 481 U.S. at 798, 107 S.Ct. 2124).

38. *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981) (quoting *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949)).

39. *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 288 (S.D.N.Y.2000) (quoting *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)).

40. *United States v. United Mine Workers of Am.,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). *See also Powell,* 643 F.2d at 931.

41. *United Mine Workers,* 330 U.S. at 295, 67 S.Ct. 677.

determined without further proceedings because of a factual dispute as to when CBK's New York branch was closed.

■ New York subjects a foreign corporation to general jurisdiction if it is "doing business" in the state, a standard assessed through the examination of the corporation's contacts with the state. Moreover, jurisdiction over a foreign corporation may be established in New York if the foreign corporation has a New York subsidiary or affiliate which serves as a "mere department" of the corporation.[42]

> [T]he law seems fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law. New York has long adhered to the general rule that when considered with relation to the parent bank, branches are not independent agencies; they are what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business and are established for its own particular purposes, and their property and assets belong to the parent bank, although nominally held in the names of the particular branches.[43]

Thus, a bank that maintains a branch in the Southern District of New York is subject to this Court's general jurisdiction because it is considered to be "doing business" in the District.[44] Because personal jurisdiction is assessed from the time a petition is filed, whether or not this Court has in personam jurisdiction over CBK depends on the status of CBK's New York branch at the time this proceeding was initiated. If the New York branch was operative at that time, CBK is subject to general jurisdiction in the Southern District because it was doing business in the state. On the other hand, if the New York branch had already closed, then CBK was no longer doing business in the state and is not subject to general jurisdiction.[45] However, this Court's jurisdiction over CBK cannot be determined at this juncture because there is a dispute over when CBK's New York branch was closed.[46]

### B. Validity of the Turnover Order

■ Even if the Court had jurisdiction over CBK, the Court lacked authority to order CBK to transfer assets from Kuwait into the Southern District of New York. Federal Rule of Civil Procedure 69(a) authorizes a district court to enforce a judgment by attaching property in accordance with the law of the state in which the district court sits.[47] Section 5225 of the CPLR authorizes a court to order the delivery of property that belongs to a

---

**42.** See *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.1998).

**43.** *Greenbaum v. Handlesbanken, NY*, 26 F.Supp.2d 649, 652–53 (S.D.N.Y.1998) (quotations omitted).

**44.** See *Varga v. Credit Suisse*, 155 N.Y.S.2d 655, 659 (1956) (exercising general jurisdiction over Credit Suisse because it maintained a branch in New York and, therefore, was doing business in New York), *dismissed on other grounds*, 5 A.D.2d 289, 171 N.Y.S.2d 674 (1st Dep't). *See also* N.Y. Banking L. §§ 200–a, 200–b (authorizing foreign banks that operate a branch or agency in New York to sue and be sued).

**45.** Both Mones and CBK make much of the separate entity rule in their briefs; however, the rule is irrelevant in this context. The separate entity rule states that service of a writ of execution upon one branch of a bank is insufficient to attach funds held by other branches of the bank. The separate entity rule does not affect this case because Mones served CBK in New York and Kuwait (assuming service in Kuwait was proper).

**46.** See Reply Mem. at 3 (alleging CBK was doing business in New York as late as February 2004); Opp. Mem. at 3 (alleging CBK's New York branch was liquidated on June 30, 2003).

**47.** See Fed.R.Civ.P. 69(a) ("Process to enforce a judgment for the payment of money shall be by writ of execution, unless the court directs otherwise. The procedure on execution, in

judgment debtor but is being held by a third-party.[48] Courts have repeatedly held, however, that this power is limited to ordering the delivery of property that is located within the court's jurisdiction. "It is a well-established principle that a New York court cannot attach property not within its jurisdiction."[49] A New York court with personal jurisdiction over a judgment debtor may order the debtor himself to deliver property into the jurisdiction;[50] however, regardless of the court's jurisdiction over a financial intermediary, "there is no statutory authority under New York law to require ... a financial intermediary to transfer property from outside this jurisdiction pursuant to Rule 69(a)."[51]

Mones cites *Mones v. National Bank of Kuwait, S.A.K.*,[52] an enforcement action predicated on the same judgment as the case currently before the Court, for the

proposition that the "otherwise" clause of Rule 69 provides this Court with the power to attach funds held by foreign branches of CBK. In that case, a Turnover Order was issued requiring the delivery of assets held in the judgment debtors' accounts, notwithstanding the fact that those accounts were located at the bank's Kuwait branch. The court held that because it had personal jurisdiction over National Bank of Kuwait ("NBK"), "[t]here appear[ed] to be no valid reason why Petitioner should not be permitted to go forward as to those funds."[53] However, the court in *Mones v. NBK* "does not explain how personal jurisdiction over the Bank of Kuwait led to in rem jurisdiction over the bank's assets, a finding which goes against the weight of prior authority."[54]

In *Koehler v. Bank of Bermuda Limited*, the court discussed the holding of *Mones* and explicitly rejected the proposi-

proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.").

48. *See* CPLR § 5225 ("Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor....").

49. *Koehler v. Bank of Bermuda Ltd.*, No. M18–302, 2005 WL 551115, at *11 (S.D.N.Y. Mar. 9, 2005).

50. *See Starbare II Partners, L.P. v. Sloan*, 216 A.D.2d 238, 629 N.Y.S.2d 23, 23 (1st Dep't

1995) ("Since the IAS court had personal jurisdiction over defendant and judgment debtor Stephen Sloan, it was entitled under CPLR 5225(a) to order him to turn over to the Sheriff of the City of New York property located outside of the State."). *See also In re Feit & Drexler*, 760 F.2d 406, 414 (2d Cir.1985) (holding that where the court had jurisdiction over the judgment debtor, it could order her to transfer property located outside New York into the court's jurisdiction).

51. *Koehler*, 2005 WL 551115, at *13. *See also McCloskey v. Chase Manhattan Bank*, 11 N.Y.2d 936, 228 N.Y.S.2d 825, 825, 183 N.E.2d 227 (1962) (affirming lower court's grant of summary judgment in favor of bank on the ground that court lacked jurisdiction over assets in foreign accounts even though the court had jurisdiction over the judgment debtor and the bank).

52. No. M18–32, 2004 WL 594855 (S.D.N.Y. Mar. 24, 2004).

53. *Id.*, at *1.

54. *Koehler*, at *13.

tion that personal jurisdiction over a financial intermediary authorizes a court to order the intermediary to deliver the property of a judgment debtor into the jurisdiction.[55] The court held that there is no "independent New York statutory authority for ordering such a transfer, even if this Court has personal jurisdiction over the [third-party] defendant." [56] Similarly, in *Fidelity Partners, Inc. v. First Trust Company of New York,* the court rejected the argument that it could order a third party to transfer assets into the district, stating that although there is case law supporting a court's authority to order a judgment debtor itself to make such a transfer, there is no precedent indicating that the court has this authority over a financial intermediary.[57]

Mones further contends that, even if New York law does not authorize an order for the transfer of assets into the jurisdiction by a financial intermediary, Rule 69(a) authorizes this Court to exceed the bounds of state law and order CBK to transfer assets into the jurisdiction. Rule 69 does contain two clauses that arguably provide the Court with power beyond the limitations of state law. First, state law is superceded "where any statute of the United States governs" and second, enforcement of judgments shall be by writ of execution, governed by state procedures, "unless the court directs otherwise." [58]

 The first exception is irrelevant because no federal statute governs this case.[59] However, several courts have dis-

---

**55.** *See id.*

**56.** *Id.,* at *12.

**57.** *See Fidelity Partners v. First Trust Co. of New York,* 58 F.Supp.2d 52, 54–55 (S.D.N.Y. 1997). There have been indications that New York courts are reconsidering the laws governing financial intermediaries in light of the increasingly international nature of most banks and the computerization of the banking industry, which has greatly improved the ability of bank branches to access information about accounts held by other branches. For example, in *Gavilanes v. Matavosian,* 123 Misc.2d 868, 475 N.Y.S.2d 987 (1984), the court held that Bank of America could be forced to respond to an information subpoena served upon its New York office that requested information about an account held at the bank's San Francisco office. However, the court specifically limited its holding to information subpoenas and reiterated the well-known rule that a New York court may not attach property that lies outside its jurisdiction. Similarly, in *Digitrex v. Johnson,* 491 F.Supp. 66 (S.D.N.Y.1980), the court partially rejected New York's long-standing separate entity rule, which requires that service of an attachment be made at the bank branch where the account is held. The *Digitrex* court held that, because "most if not all New York City commercial banks ... have become largely computerized," service at the main branch of a bank is sufficient to attach funds held at other bank branches within the jurisdiction. *See Digitrex,* 491 F.Supp. at 69. However, when faced with facts nearly identical to those currently before this Court, the Appellate Division, First Department held that the *Digitrex* holding cannot be extended to allow attachment of accounts outside the jurisdiction without "a pronouncement from the Court of Appeals or an act of the Legislature." Without such a pronouncement, this Court likewise can neither apply *Digitrex* nor extend its holding.

**58.** Fed.R.Civ.P. 69(a).

**59.** Mones cites *United States v. First Nat'l City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965), to support this Court's exercise of jurisdiction over bank accounts held in Kuwait. In *First National,* the Court issued a restraining order against foreign bank accounts belonging to the judgment debtor. However, the court did so pursuant to 26 U.S.C. § 7402(a), which gives district courts the power to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws." In upholding the injunction, the Supreme Court specifically noted that "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." 379 U.S. at 382, 85 S.Ct. 528. Because there is no feder-

cussed the possibility that the second exception, "unless the court directs otherwise," authorizes courts to exceed state procedures governing writs of execution and to enforce money judgments by ordering delivery of a judgment debtor's assets in just these circumstances. While the Second Circuit does not appear to have interpreted Rule 69's "otherwise" clause,[60] the First Circuit has held that the " 'otherwise' clause is narrowly construed" and that there is no reason to depart from the traditional view that Rule 69(a) " 'limit[s] all federal process on money judgments to the type of process available under state law.' "[61] The "otherwise" clause should be invoked only in "extraordinary circumstances" and "does not authorize enforcement of a civil money judgment by methods other than a writ of execution, except where 'well established principles [so] warrant."[62]

In *Motorola Credit Corporation v. Uzan,* a judgment creditor moved for an order requiring various banks to transfer funds into the court's registry from the accounts of judgment debtors that were held at bank branches outside the court's jurisdiction. Because service of process had been made at each bank's main office rather than at the branch holding the account, the order could only be issued if the court invoked the "otherwise" clause of Rule 69 to set aside New York's separate entity rule, which requires that service be made at the branch holding the account. The court reasoned that even if the Second Circuit does not require the First Circuit's showing of "extraordinary circumstances" to justify resort to the "otherwise" clause, the petitioner would at least have to show "that it does not have an adequate remedy at law" to justify the use of the court's power under the "otherwise" clause.[63] Specifically, the petitioner would have to show that an order directing the individual judgment debtors to transfer the funds themselves was unavailing and that "its attempts to enforce its judgment against the relevant bank accounts in the countries in which the funds are actually located have proven nugatory."[64]

Although the petition currently before the Court addresses a different provision of New York law, the principle is the same. Petitioner has failed to show any special or extraordinary circumstances that would warrant the invocation of the "otherwise" language in Rule 69, even if this Court considers that clause to authorize the exercise of power beyond the limits of New York law.

al law authorizing the Turnover Order, the Court must be constrained by the bounds of New York law, which as already observed, does not allow the exercise of power over assets held outside the jurisdiction by financial intermediaries.

60. Although the Second Circuit has not addressed this precise question, it has stated numerous times that the enforcement of judgments is governed by the law of the state in which the district court sits. *See, e.g., Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 83 (2d Cir.2002) ("In the instant action, the district court is located in New York state. We therefore apply New York law to determine what assets are 'subject to enforcement....' "); *Alliance Bond Fund, Inc. v.*

*Grupo Mexicano De Desarrollo, S.A.,* 190 F.3d 16, 20 (2d Cir.1999) (holding that the validity of a turnover order depends on whether the district court "acted in accordance with New York's procedures for the enforcement of judgments.").

61. *Aetna Cas. & Sur. Co. v. Markarian,* 114 F.3d 346, 350 (1st Cir.1997) (quoting *Gabovitch v. Lundy,* 584 F.2d 559, 560 (1st Cir. 1978)).

62. *Id.*

63. *See Motorola Credit Corp. v. Uzan,* 288 F.Supp.2d 558, 562 (S.D.N.Y.2003).

64. *Id.*

Because this Court lacks the power to direct CBK to transfer assets of the judgment debtors from Kuwait into New York, the Turnover Order was invalid and is hereby vacated.

### C. Motion for Contempt

 As already stated, the Turnover Order was invalid because this Court is without power to order a financial intermediary to transfer assets from Kuwait into this jurisdiction. In light of the purposes behind the civil contempt power, it would be inappropriate to hold CBK in contempt for its non-compliance with an order that the Court must now vacate. *First,* this Court will not act to coerce compliance with an invalid order. *Second,* Mones can have suffered no loss as a result of CBK's non-compliance with an invalid order. Although "[i]t is true that the reversal of the decree does not retroactively obliterate the past existence of the violation ... the right which [the Order] affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do." [65] Because the Turnover Order is vacated, Mones's petition for contempt is denied.

## V. CONCLUSION

For the foregoing reasons, the Turnover Order is vacated and Mones's motion for contempt is denied. The Clerk of the Court is directed to close this motion (docket # 22).

SO ORDERED.

---

**65.** *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d 727, 727 (2d Cir. 1936). *Accord United Mine Workers,* 330 U.S. at 295, 67 S.Ct. 677.